1
2
3
4
5
6
7
8
9
10

# UNITED STATES DISTRICT COURT

11

## SOUTHERN DISTRICT OF CALIFORNIA

12

13   RITA MAHONEY, *et al.*,          Case No. 13-cv-2530-W (JMA)

14                     Plaintiffs,   **ORDER DENYING**
                                     **DEFENDANTS' MOTION TO**
15      v.                           **DISMISS [DOC. 10]**
16
17   BANK OF AMERICA, NATIONAL
     ASSOCIATION, *et al.*,
18
19                     Defendants.

20        Pending before the Court is a motion to dismiss filed by Defendants Bank of

21   America, National Association ("BANA") and Nationstar Mortgage LLC

22   ("Nationstar").  Plaintiffs Rita Mahoney and Eric Johnston oppose.

23        The Court decides the matter on the papers submitted and without oral

24   argument.  <u>See</u> Civ. L.R. 7.1(d.1).  For the following reasons, the Court **DENIES**

25   Defendants' motion to dismiss [Doc. 10].

26   //

27   //

28

## I.   BACKGROUND

The parties are well aware of the facts based on this Court's previous order on Defendants' motion to dismiss the initial Complaint.

This lawsuit arises out of Plaintiff's purchase on or about April 2, 2004 of real property in San Diego, California.  (*First Am. Compl.* ("FAC") [Doc. 9] at ¶ 7, Ex. B [Doc. 9-1]; *Defs.' RJN* [Doc. 10-1] at Ex. A.)   In order to purchase the property, Plaintiffs obtained a $960,000 mortgage loan, which is secured by a deed of trust encumbering the property.  (*Id.*)

In October 2011, beneficial interest in the loan was assigned to BANA. (*Defs'. RJN* at Ex. B.)  Then in June 2012, BANA reassigned the beneficial interest to Deutche Bank National Trust Company, as Trustee for the Holders of the GSR Mortgage Loan Trust 2004-7.  (*Id.* at Ex. C.)  BANA, however, continued to service the loan until July 1, 2013, when servicing was transferred to Nationstar.  (*FAC* at ¶ 24.)

According to the FAC, after purchasing the property, Plaintiffs made timely monthly mortgage payments. (*FAC* at ¶ 9.)  In 2011, their monthly mortgage payment increased from $3,800 to $5,900 because the loan changed from a fixed rate, interest only loan to an adjustable-rate mortgage.  (*Id.* at ¶ 10.)  Plaintiffs struggled to make these increased payments, so in June 2011, Plaintiffs "met with [BANA] loan representatives at a mortgage modification workshop . . . to request that the Loan be restructured, and were told that they were excellent candidates for a loan modification."  (*Id.*)   However, Plaintiffs were subsequently told that their loan modification was rejected because they "were not yet in default and must be in imminent default to be considered for a modification."  (*Id.*)   Allegedly following BANA's instructions, Plaintiffs intentionally became delinquent on their loan in order to obtain a loan modification.  (*Id.*)

On June 12, 2012, a notice of default was recorded against Plaintiffs.  (*FAC* at ¶ 11; *Defs.' RJN* at Ex. D.)  However, the notice of default was rescinded on August 16, 2013.  (*Id.* at Ex. E.)

Meanwhile, in July 2012, Plaintiffs filed a Chapter 13 bankruptcy petition, but contend that they began paying their monthly mortgage on time. (*FAC* at ¶ 12; *see also Defs.' RJN* Ex. F.)  In October 2012, the bankruptcy was converted to Chapter 7, and during that time, Plaintiffs allege that they "continued to pay their monthly mortgage payments on time, which [] were accepted by [BANA]." (*Id.* at ¶ 12.)

In November 2012, Plaintiffs "decided to liquidate their retirement savings to pay the balance of their arrears on the mortgage by the end of 2012." (*FAC* at ¶ 13.) Throughout November 2012 and into December 2012, Plaintiffs attempted to get a reinstatement quote from BANA, but were unable to obtain a response. (*Id.* ¶¶ 13–15.) Accordingly, on December 28, 2012, Plaintiffs called BANA "to request that [BANA] accept a payment of $50,000.00 over the phone so Plaintiffs could at least pay the majority of the delinquent balance[,]" which they estimated to be approximately $50,000-$60,000. (*Id.*, ¶ 16.) According to Plaintiffs, the BANA representative agreed to the request, and "told Plaintiffs that the $50,000 payment would be accepted and credited to their account in 2012." (*Id.*)  Plaintiffs, therefore, made a $50,000 payment over the phone on December 28, 2012 in order "to pay off the majority of their delinquent balance in the year 2012 so that they could obtain the tax write-off." (*Id.*) BANA failed to deposit and credit the payment until January 2013, and failed to provide Plaintiffs with a 1098 tax form reflecting the $50,000 payment. (*Id.*, ¶ 17.)

In January 2013, Plaintiffs made another timely mortgage payment that BANA appeared to accept and apply to the loan. (*FAC* at ¶ 18.)  Though not alleged in the complaint, it appears the bankruptcy was discharged on approximately January 23, 2013.

In February 2013, Plaintiffs again submitted a timely mortgage payment, but this time BANA returned the payment with the explanation that the amount was "insufficient to reinstate the account." (*FAC*, ¶ 18.)  Plaintiffs contacted BANA to again request the 1098 tax form for 2012 and a quote for the amount of the remaining reinstatement balance, but BANA failed to provide both. (*Id.*, ¶ 19.)  They allege that

1   for the next four months, Plaintiffs continued calling BANA weekly requesting a

2   reinstatement quote and payment history, but to no avail.  (*Id.*, ¶ 20.)  Additionally,

3   while BANA was preventing Plaintiffs from reinstating their account, BANA was

4   continuing to assess "late fees and penalties on the delinquent balance each month, and

5   would not accept their monthly mortgage payments."  (*Id.*)

6       Finally, in May 2013, Plaintiffs received a response from BANA.   The

7   correspondence was a mortgage statement dated May 6, 2013 stating that Plaintiffs'

8   delinquent amount was $48,441.30 in "outstanding payments, late fees and penalties."

9   (*FAC*, ¶ 22.)  Two days later, Plaintiffs received a second correspondence stating that

10  BANA "intended to foreclose on their property, and showed a reinstatement amount

11  of $39,333.65 which included $963.88 in late fees, and stated that the last payment had

12  been on October 1, 2012, which completely ignored the Plaintiffs' payment in

13  December 2012 and regular monthly payment in January 2013."  (*Id.*)  On June 4, 2013,

14  Plaintiffs sent a formal Qualified Written Request ("QWR") to BANA demanding

15  (1) the payment history on their loan, (2) an accounting of their $50,000 payment, and

16  (3) an accounting of their penalties and fees.  (*Id.*, ¶ 23.)

17      On July 1, 2013, BANA transferred the servicing of the loan to Nationstar.

18  (*FAC*, ¶ 24, Exs. K and L.)  In the Servicing Transfer Notice, BANA acknowledged

19  their duty to provide Plaintiffs with the payment history of their loan and an accounting

20  through a QWR that Plaintiffs had submitted, and further acknowledged their duty to

21  transfer all of the records of the loan to Nationstar.  (*Id.*, ¶ 24, citing Ex. K.)  Nationstar

22  allegedly failed and refused to respond to Plaintiffs' June 4, 2013 QWR.  (*Id.*, ¶ 25.)

23  Nationstar further "failed and refused to respond to the Plaintiffs' phone calls in July

24  and August 2013 in which they requested a payment history of their Loan, an

25  accounting of their past payment of $50,000, and to show an accounting of the

26  penalties and fees that [BANA] and NATIONSTAR had applied."  (*Id.*)

27      Eventually, Nationstar responded to Plaintiffs, but like BANA, provided

28  conflicting information.  (*FAC*, ¶ 26.)  On August 8, 2013, Nationstar returned

Plaintiffs' mortgage payment with a letter stating that the payment was returned because the amount was "insufficient to reinstate the account." (*Id.*)  The letter also identified a reinstatement amount of $59,110.12, but included "qualifying language instructing the Plaintiffs that this amount is subject to change and thus to call NATIONSTAR to obtain an up-to-date amount owed." (*Id.*)  A few days later, on August 14, 2013, Plaintiffs called Nationstar to verify the reinstatement amount, and the Nationstar representative told them that the reinstatement amount was $65,769.62. (*Id.*)  On August 21, 2013, a Nationstar representative provided a third reinstatement quote of $61,068.46, which did not include an additional $15,248.33 in late fees, penalties, and attorney's fees; Nationstar also refused Plaintiffs' demand for a written account of the penalties and fees.  (*Id.*)

On September 3, 2013, Plaintiffs received correspondence from Nationstar regarding their QWR, which did not provide the information Plaintiffs requested. (*FAC*, ¶ 26.)  Specifically, it failed to include a full payment history and schedule reflecting all payments (including the $50,000 payment), as well as accrued interest, penalties, and late fees related to their loan.  (*Id.*)  Nationstar also failed to provide an "accurate" reinstatement quote.  (*Id.*)

On September 12, 2013, Plaintiffs commenced this action in the San Diego Superior Court.  Defendants then removed the case to this Court and filed a motion to dismiss the Complaint. On January 28, 2014, this Court issued an order granting in part and denying in part Defendants' motion.  (*See MTD Order* [Doc. 8].)

On February 18, 2014, Plaintiffs filed the FAC asserting claims for: (1) breach of contract; (2) declaratory relief; (3) negligent loan administration; (4) injunctive relief; and (5) breach of contract - specific performance.  Defendants' motion to dismiss followed, which reasserts many of the arguments rejected in the MTD Order.  In support of their motion to dismiss, Defendants also request judicial notice of certain documents.

1    II.    Legal Standard

2           The court must dismiss a cause of action for failure to state a claim upon which

3    relief can be granted.  Fed. R. Civ. P. 12(b)(6).  A motion to dismiss under Rule

4    12(b)(6) tests the legal sufficiency of the complaint.  Navarro v. Block, 250 F.3d 729,

5    732 (9th Cir. 2001).  The court must accept all allegations of material fact as true and

6    construe them in light most favorable to the nonmoving party.  Cedars-Sanai Med. Ctr.

7    v. Nat'l League of Postmasters of U.S., 497 F.3d 972, 975 (9th Cir. 2007).  Material

8    allegations, even if doubtful in fact, are assumed to be true.  Bell Atl. Corp. v. Twombly,

9    550 U.S. 544, 555 (2007).  However, the court need not "necessarily assume the truth

10   of legal conclusions merely because they are cast in the form of factual allegations."

11   Warren v. Fox Family Worldwide, Inc., 328 F.3d 1136, 1139 (9th Cir. 2003) (internal

12   quotation marks omitted).  In fact, the court does not need to accept any legal

13   conclusions as true.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

14          "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need

15   detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his

16   'entitlement to relief' requires more than labels and conclusions, and a formulaic

17   recitation of the elements of a cause of action will not do."  Twombly, 550 U.S. at 555

18   (internal citations omitted).  Instead, the allegations in the complaint "must be enough

19   to raise a right to relief above the speculative level."  Id.  Thus, "[t]o survive a motion

20   to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state

21   a claim to relief that is plausible on its face.'"  Iqbal, 556 U.S. at 678 (citing Twombly,

22   550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual

23   content that allows the court to draw the reasonable inference that the defendant is

24   liable for the misconduct alleged."  Id.  "The plausibility standard is not akin to a

25   'probability requirement,' but it asks for more than a sheer possibility that a defendant

26   has acted unlawfully."  Id.  A complaint may be dismissed as a matter of law either for

27   lack of a cognizable legal theory or for insufficient facts under a cognizable theory.

28   Robertson v. Dean Witter Reynolds, Inc., 749 F.2d 530, 534 (9th Cir. 1984).

Generally, courts may not consider material outside the complaint when ruling on a motion to dismiss. <u>Hal Roach Studios, Inc. v. Richard Feiner & Co.</u>, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990). However, documents specifically identified in the complaint whose authenticity is not questioned by parties may also be considered. <u>Fecht v. Price Co.</u>, 70 F.3d 1078, 1080 n.1 (9th Cir. 1995) (superceded by statutes on other grounds). Moreover, the court may consider the full text of those documents, even when the complaint quotes only selected portions. <u>Id.</u> It may also consider material properly subject to judicial notice without converting the motion into one for summary judgment. <u>Barron v. Reich</u>, 13 F.3d 1370, 1377 (9th Cir. 1994).

## III.   DISCUSSION

### A.   Judicial Notice

In support of their motion to dismiss, Defendants request judicial notice of various documents related to the subject property and Plaintiffs' bankruptcy proceedings. (*See Defs.' RJN*.)

Under Rule 201 of the Federal Rules of Evidence, a court may take judicial notice of a fact that is not "subject to a reasonable dispute" because "it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(a). Judicial notice "may be taken at any stage of the proceeding." Fed. R. Evid. 201(f). Further, judicial notice is mandatory "if requested by a party and supplied with the necessary information." Fed. R. Evid. 201(d).

Because the documents for which Defendants request judicial notice are not subject to reasonable dispute, the Court **GRANTS** Defendants' request.

//

//

**B.    Plaintiffs do not lack standing.**

Defendants again argue that Plaintiffs' negligent-loan-administration claim belongs to the bankruptcy trustee and thus Plaintiff lack standing to assert the claim. The is argument is premised on 11 U.S.C. § 541(a)(1), which provides that the bankruptcy estate consists of "all legal or equitable interests of the debtor in property as of the commencement of the case." This includes causes of action against third parties. Cusano v. Klein, 264 F.3d 936, 945 (9th Cir. 2001). Thus, if the debtor fails "properly to schedule an asset, including a cause of action, that asset continues to belong to the bankruptcy estate and [does] not revert to" the debtor. Id. at 945–946.

Here, Defendants contend that Plaintiffs' cause of action for negligent loan administration accrued on January 7, 2013, when their $50,000 check was posted to their checking account. Because the claim accrued before Plaintiffs' bankruptcy was discharged, Defendants argue the claim belongs to the bankruptcy trustee and Plaintiffs lack standing to pursue the claim. The Court is not persuaded for at several reasons.

Assuming Plaintiffs' knowledge that the check was cashed or credited in January 2013 is sufficient notice of the negligent loan administration, Defendants' argument lacks merit for two reasons. First, Defendants have failed to identify any damages that Plaintiffs incurred before the bankruptcy was discharged from the negligent loan administration. In the absence of damages directly related to Defendants' negligence, the cause of action did not accrue in January 2013.[1] Naftzger v. American Numismatic Society, 42 Cal. App. 4th 421, 428 (1996).

---

[1] It is also unclear when Plaintiffs discovered that the check was not cashed until January 2013. Defendants' argument relies on Exhibit F to the FAC. That exhibit appears to have been printed from the banking website on May 30, 2013. (See FAC, Ex. F at bottom of p. 1.) Additionally, the FAC alleges BANA's representative specifically represented to Plaintiffs that the check would be credited in 2012, and that Plaintiffs contacted BANA in February 2013 requesting a 1098 tax form reflecting the $50,000 payment. (FAC, ¶¶ 16, 19.) Based on Exhibit F, BANA's alleged misrepresentation in December 2012, and the February 2013 contact, it is reasonable to infer that Plaintiffs did not discover when the check was actually cashed until well after the bankruptcy discharge occurred.

1       Second, the negligent loan administration claim is not based simply on

2   Defendants' failure to credit Plaintiffs' account in 2012.  Instead, the claim is based on

3   Defendants' misconduct, detailed in the FAC, through at least September 2013.

4       Finally, Defendants' entire argument rests on the theory that, although the

5   payment was *made* in 2012, as a matter of law, Plaintiffs' account could not be credited

6   until the check was deposited in 2013.  But Defendants have cited no authority or

7   evidence supporting this underlying premise.  In the absence of such authority, it is not

8   reasonable to assume that Plaintiffs' alleged knowledge that the check was "deposited"

9   or "cashed" in January 2013 was sufficient notice of Defendants' negligence in

10  administering the loan.   Particularly given that Plaintiffs allege that BANA's

11  representative represented that the payment would be "*accepted* and *credited*" (not

12  deposited or cashed) in 2012.  (*FAC* at 16, emphasis added.)

13

14  **C.   <u>Plaintiffs are not judicially estopped.</u>**

15      Defendants again argue that Plaintiffs' negligent-loan-administration cause of

16  action should also be dismissed because Plaintiffs are judicially estopped for failing to

17  disclose the claim on their bankruptcy schedules.  "Judicial estoppel is an equitable

18  doctrine that precludes a party from gaining an advantage by asserting one position, and

19  then later seeking an advantage by taking a clearly inconsistent position." <u>Hamilton</u>

20  <u>v. State Farm Fire & Cas. Co.</u>, 270 F.3d 778, 782 (9th Cir. 2001) (citing <u>Rissetto v.</u>

21  <u>Plumbers & Steamfitters Local 343</u>, 94 F.3d 597, 600-01 (9th Cir. 1996); <u>Russell v.</u>

22  <u>Rolfs</u>, 893 F.2d 1033, 1037 (9th Cir.1990)).  Judicial estoppel is used to bar inconsistent

23  positions in the same litigation, and is also "appropriate to bar litigants from making

24  incompatible statements in two different cases." <u>Hamilton</u>, 270 F.3d at 783.  Courts

25  may consider the following three factors in determining whether the doctrine of judicial

26  estoppel applies: (1) whether "a party's later position must be 'clearly inconsistent' with

27  its earlier positions"; (2) "whether the party has succeeded in persuading a court to

28  accept that party's earlier position, so that judicial acceptance of an inconsistent

position in a later proceeding would create 'the perception that either the first or the second court was misled'"; and (3) "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." Id. at 782-83 (quoting New Hampshire v. Maine, 532 U.S. 742, 750-51 (2001)) (internal quotation marks omitted).  "In the bankruptcy context, courts have applied judicial estoppel to prevent debtors who failed to disclose claims in bankruptcy proceedings from later asserting those claims after their bankruptcy case has closed." Abuan v. JPMorgan Chase & Co., No. 13cv1315, 2013 WL 5522221, at *2 (S.D. Cal. Oct. 3, 2013) (citing Hamilton, 270 F.3d at 783) (Lorenz, J.).

A debtor's duty to disclose potential claims as assets continues for the duration of the bankruptcy proceedings.  Hamilton, 270 F.3d at 785; United States v. Nunez, 419 F. Supp. 2d 1258, 1264 (S.D. Cal.2005).  "Judicial estoppel will be imposed when the debtor has knowledge of enough facts to know that a potential cause of action exists during the pendency of the bankruptcy, but fails to amend his schedules or disclosure statements to identify the cause of action as a contingent asset." Hamilton, 270 F.3d at 784; see also Hay v. First Interstate Bank of Kalispell, N.A., 978 F.2d 555, 557 (9th Cir.1992) (acknowledging that "all facts were not known to [the debtor] at the time, but enough was known to require notification of the asset to the bankruptcy court").

Defendants contend that Plaintiffs failed to include their claims asserted in this action in their bankruptcy schedules even though the alleged misconduct purportedly took place before the bankruptcy was discharged.   For the same reasons addressed above with respect to Defendants' standing argument, the Court finds this argument lacks merit.

### E.   The FAC's allegations are sufficient to establish a duty.

Defendants argue that Plaintiffs' negligence claim also fails because they owed no duty to Plaintiffs.  "The existence of a duty of care owed by a defendant to a plaintiff

1   is a prerequisite to establishing a claim for negligence." <u>Nymark v. Heart Fed. Sav. &</u>
2   <u>Loan Ass'n</u>, 231 Cal. App. 3d 1089, 1095 (1991).  "The 'legal duty' of care may be of
3   two general types: (a) the duty of a person to use ordinary care in activities from which
4   harm might reasonably be anticipated, or (b) an affirmative duty where the person
5   occupies a particular relationship to others." <u>McGettigan v. Bay Area Rapid Transit</u>
6   <u>Dist.</u>, 57 Cal. App. 4th 1011, 1016-17 (1997) (internal quotation marks omitted).  "In
7   the first situation, [the defendant] is not liable unless he is actively careless; in the
8   second, he may be liable for failure to act affirmatively to prevent harm." <u>Id.</u>

9        "[A]s a general rule, a financial institution owes no duty of care to a borrower
10   when the institution's involvement in the loan transaction does not exceed the scope
11   of its conventional role as a mere lender of money." <u>Nymark</u>, 231 Cal. App. 3d at 1096.
12   "Liability to a borrower for negligence arises only when the lender 'actively participates'
13   in the financed enterprise 'beyond the domain of the usual money lender.'" <u>Wagner v.</u>
14   <u>Benson</u>, 101 Cal. App. 3d 27, 35 (1980) (quoting <u>Connor v. Great W. Sav. & Loan</u>
15   <u>Ass'n</u>, 69 Cal. 2d 850, 864 (1968)).

16        Here, Defendants' contention that they did not owe a duty to Plaintiffs is
17   premised on the traditional relationship between a lending institution and its borrower
18   client.  (<i>See MTD</i>, 6:8–21.)  Here, however, Defendants are not being sued for their
19   conventional role as "mere lender of money." <u>See</u> <u>Nymark</u>, 231 Cal. App. 3d at 1096.
20   In light of the facts alleged in the FAC, and the authorities cited in Plaintiffs'
21   opposition, the Court finds Defendants' argument lacks merit.

22

23        **D.    <u>The economic loss rule does not bar Plaintiffs' claim.</u>**

24        The economic loss rule "prevent[s] the law of contract and the law of tort from
25   dissolving one into the other." <u>Robinson Helicopter Co., Inc. v. Dana Corp.</u>, 34 Cal.
26   4th 979, 988 (2004) (internal quotations marks omitted).  The rule generally bars tort
27   actions for contract breaches, thereby limiting contracting parties to contract damages.
28   <u>Aas v. Super. Ct.</u>, 24 Cal. 4th 627, 643 (2000).  It precludes recovery for "purely

economic loss due to disappointed expectations," unless the plaintiff "can demonstrate harm above and beyond a broken contractual promise." <u>Robinson Helicopter</u>, 34 Cal. 4th at 988. In other words, "[a] person may not ordinarily recover in tort for the breach of duties that merely restate contractual obligations." <u>Aas</u>, 24 Cal. 4th at 643. "[C]onduct amounting to a breach of contract becomes tortious only when it also violates a duty independent of the contract arising from principles of tort law." <u>Robinson Helicopter</u>, 34 Cal. 4th at 989.

Defendants argue that this rule bars the negligence claim because Plaintiffs allege purely economic injuries. Assuming for the sake of argument that the rule applies to Plaintiffs' claim, the FAC specifically alleges that Plaintiffs suffered "severe emotional distress, worry and anxiety." (FAC, ¶ 47.) In light of the detailed allegations of Defendants' conduct in the FAC, the Court finds Plaintiffs' allegation sufficient.

### E.  <u>Plaintiffs have sufficiently pled specific performance.</u>

Defendants argue that Plaintiffs' claim for specific performance fails for two reasons. First, Defendants contend that because Plaintiffs defaulted on their loan, Plaintiffs are not entitled to specific performance under California Civil Code § 3392. This section provides, in relevant part, that "[s]pecific performance cannot be enforced in favor of a party who has not fully and fairly performed all the *conditions precedent* on his part to the obligation of the other party. . . ." <u>Id.</u> (emphasis added).

Here, Plaintiffs are suing Defendants for breaching an obligation that contemplated Plaintiffs failure to make payments on the loan. Specifically, Plaintiffs are suing Defendants for failing to provide reinstatement quotes in order to bring their loan current. (FAC, ¶¶ 57–60.) As the moving party, Defendants have failed to demonstrate that Plaintiffs' obligation to remain current on the loan is a "condition precedent" to Defendants' obligation to provide a reinstatement quote. Indeed, the very obligation–to provide Plaintiffs a reinstatement quote–seems to contemplate that

1  Plaintiffs have fallen behind in their payments and, therefore, need the quote to bring

2  the loan current.  Accordingly, Defendants' first argument lacks merit.

3        Defendants next argue that the claim is barred because Plaintiffs have an

4  adequate remedy through an award of monetary damages.  In support of this argument,

5  Defendants cite <u>Wilkison v Wiederkehr</u>, 101 Cal. App. 4th 822 (2002), which reversed

6  a trial court's grant of quasi-specific performance based on the principle that where

7  "plaintiff's cause of action is one for which the legal remedy of damages is generally

8  deemed adequate, it does not become inadequate and justify a decree of specific

9  performance merely because the legal remedy has been lost through neglect." <u>Id.</u> at

10 835. <u>Wilkison</u>, however, is not a pleading case and thus does not preclude a plaintiff

11 from pleading alternative remedies.  Nor do Defendants provide any authority

12 addressing Plaintiffs' contention that they are allowed to plead specific performance as

13 an alternative theory.  Accordingly, Defendants' argument is unavailing.

14

15 **IV.  CONCLUSION & ORDER**

16       In light of the foregoing, the Court **DENIES** Defendants' motion to dismiss

17 [Doc. 10].

18

19       **IT IS SO ORDERED.**

20

21 DATE: May 27, 2014

22                                           _____

23                                           Hon. Thomas J. Whelan
                                            United States District Judge

24

25

26

27

28